959 N.E.2d 114 (2011)
355 Ill. Dec. 86
The DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, Petitioner,
v.
The ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; Jackie Zimmerman, Michael Coli, Michael Hade, and Albert Washington, the Members of Said Board and Panel in Their Official Capacity Only; John Brosnan, in His Official Capacity Only as Illinois Labor Relations Board Executive Director; Administrative Law Judge Colleen Harvey, in Her Official Capacity Only; The Laborers International Union of America, Illinois State Employees Association, Local 2002; Service Employees International Union Local 73; and the American Federation of State, County, and Municipal Employees, Council 31, Respondents.
No. 4-09-0966.
Appellate Court of Illinois, Fourth District.
September 28, 2011.
*117 Joseph M. Gagliardo, Mark W. Bennett, Lawrence Jay Weiner (argued), Special Assistant Attorneys General, Chicago, for Central Management Services.
Lisa Madigan, Attorney General, State of Illinois, Michael A. Scodro, Solicitor General, Paul Racette (argued), Assistant Attorney General, for IL Labor Relations Board, State Panel.
Jacob Pomeranz (argued), Mark S. Stein, Cornfield & Feldman, Chicago, for AFSCME Council 31.

OPINION
Justice STEIGMANN delivered the judgment of the court, with opinion.
¶ 1 In October 2006, correspondent, the American Federation of State, County, and Municipal Employees, Council 31 (AFSCME), filed a majority interest representation petition under the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 through 27 (West 2006)) with the Illinois Labor Relations Board (Board), seeking to include certain employees of petitioner, the Illinois Department of Central Management (CMS), in AFSCME's existing RC-62 bargaining unit.
¶ 2 In November 2009, the Board issued a decision, (1) rejecting CMS's argument that it was entitled to an oral hearing on each of the disputed CMS employees classified as a Public Service Administrator, Option 2 (hereinafter, PSA 2)which is a characterization assigned to State employees who perform many different jobs in many different agency divisionsand (2) concluding that none of the disputed PSA 2s were (a) confidential, (b) managerial, or (c) supervisory employees under the Act. American Federation of State, County & Municipal Employees, Council 31, 25 PERI ¶ 161 (ILRB State Panel Nov. 6, 2009) (Nos.S-RC-07-048, SRC-08-074)(hereinafter, 25 PERI ¶ 161).
¶ 3 CMS appeals, arguing that the Board erred by (1) denying it an oral hearing on several of the disputed PSA 2 employees and (2) concluding that none of the disputed PSA 2s were (a) confidential, (b) managerial, or (c) supervisory employees under the Act. Because we agree that (1) the Board erred by denying an oral hearing regarding several disputed PSA 2 *118 employees and (2) the Board's decision regarding the PSA 2s who were granted an oral hearing was clearly erroneous, we affirm in part, reverse in part, and remand with directions.

¶ 4 I. BACKGROUND
¶ 5 In October 2006, AFSCME filed a majority interest representation petition under the Act with the Board, seeking to include certain CMS employees in an existing RC-62 bargaining unit.
¶ 6 In October 2007, CMS submitted an offer of proof related to its PSA 2 employees. CMS proffered that of the more than 500 PSA 2s at issue, the parties agreed that a certain number should be included in the existing bargaining unit, while others should be excluded. CMS claimed that its offer of proof set forth factual support for its claim that the remaining disputed PSA 2s should be excluded as supervisory, managerial, or confidential employees under the Act.
¶ 7 Following an initial, multiple-day administrative law hearing, the administrative law judge (ALJ) sent a December 2007 letter to CMS, noting that CMS's offer of proof had been incomplete and conclusory. The ALJ concluded that CMS would have to submit a detailed offer of proof before any further hearings on the disputed PSA 2s could be held. That same month, co-respondents, the Laborers International Union (LIU) and Service Employees International Union (SEIU), each filed a majority interest representation petition under the Act, seeking to include the PSA 2s in a new bargaining unit.
¶ 8 In January 2008, the ALJ consolidated the election petitions filed by (1) AFSCME and (2) LIU and SEIU (hereinafter, the unions). Shortly thereafter, CMS filed two lengthy offers of proof, and the unions responded.
¶ 9 In May 2008, the ALJ concluded that an election should be held, ordering the results sealed until the ALJ could decide which of the disputed PSA 2s should be included in the existing bargaining unit.
¶ 10 In its intermediate order and later in its October 2008 order, the ALJ found that CMS had established, through its offers of proof, that questions of law or fact remained to be resolved as to some of the disputed PSA 2s, but not others. American Federation of State, County & Municipal Employees, Council 31, 25 PERI ¶ 161 (Administrative Law Judge's Recommended Decision and Order, Aug. 18, 2009) (Nos.S-RC-07-048, S-RC-08-074) (hereinafter, ALJ decision, 25 PERI ¶ 161). Specifically, the ALJ found, in relevant part, that CMS had established a question of law or fact sufficient to require an oral hearing as to the following 44 employees:
 Illinois Department of Revenue
 (IDOR)
 Research Office
 * Ruth Ann Day (confidential)
 * Ryan Gallagher (confidential)
 * Thomas Regan (confidential)
 * Hector Vielma (confidential)
 * Hans Zigmund (confidential)
 IDOR Budget and Planning Office
 * Lisa Ackerman (confidential)
 * Andy Grapes (confidential)
 IDOR Office of Publication Management
 * Virginia Bartletti (managerial)
 * Teresa Blauvelt (managerial)
 * Beau Elam (managerial)
 * Candace Erwin (managerial)
 * Vickie Harvey (managerial)
*119
 * Sheri Hoff (managerial)
 * Teresa Richards (managerial)
 * Jennifer Schwitek (managerial)
 * Julie Southwell (managerial)
 * Susan Spada (managerial)
 IDOR Motor Vehicle Use Tax Division
 * Mary Green (supervisory)
 IDOR Sales Tax Division
 * Chet Billows (supervisory)
 * Mitzi Brandenburg (supervisory)
 * Susan Lonzerotti (supervisory)
 IDOR Document, Control, and Deposit
 Division
 * Joseph Terry Emmett (supervisory)
 IDOR Individual Processing Division
 * Paula Hamrock (supervisory)
 * Monica Marchizza (supervisory)
 * Dottie Perkins (supervisory)
 * Cathy Scott (supervisory)
 * Sheila Washburn (supervisory)
 IDOR Excise Tax Division
 * Brock Reynolds (supervisory)
 * Brian Spelman (supervisory)
 IDOR Taxpayer Assistance Division
 (Chicago)
 * Mike Mikels (supervisory)
 (Statewide)
 * Linda Bennett (supervisory)
 * Denise Byrne (supervisory)
 * Sherry Sampson (supervisory)
 * Janine Stroble (supervisory)
 * Claire Tegtman (supervisory)
 * Jim Walkington (supervisory)
 IDOR Business Processing Division
 * Kevin Anguish (supervisory)
 * Mary Austin (supervisory)
 * Donna Mast (supervisory)
 * Matt Smith (supervisory)
 * Shirley McGlennon (supervisory)
 * Brenda Cawley (supervisory)
 Illinois Department of Natural Resources
 (IDNR)
 Office of Administration
 * Terry Von Bandy (confidential)
 IDNR Office of Land Management
 * Jeffery Oxencis (confidential).
¶ 11 The ALJ thereafter recommended that the PSA 2s for which it found that no questions of law or fact remained should be included in the bargaining unit. Specifically, the ALJ found that CMS had failed to establish a question of law or fact, and thus, no oral hearing was required with regard to the status of the following 92 employees:
 Illinois Department of Aging (Aging)
 * Rhonda Baer (supervisory)
 CMS Internal Auditors Unit
 * Lennel Beaty (confidential)
 * MaryJo Behnke (confidential)
 * James Bick (confidential)
 * Patrick Burns (confidential)
 * Jeffery Derrick (confidential)
 * James Dickey (confidential)
 * Susan Duke (confidential)
 * Jennifer Ford-Mitchell (confidential)
 * Cornine Fuchs (confidential)
 * Kermit Hellrung (confidential)
 * Stefanie Kent (confidential)
 * Catherine Madonia (confidential)
*120
 * Larry Marques (confidential)
 * Randy Martin (confidential)
 * Dennis McGill (confidential)
 * Sudershan Mittal (confidential)
 * David Mueth (confidential)
 * Jerry Nimmons (confidential)
 * Ellen Perry (confidential)
 * Terri Rauworth (confidential)
 * Daniel Ryan (confidential)
 * Edward Schofield (confidential)
 * Theodore Tracy (confidential)
 * James Walker (confidential)
 * John White (confidential)
 * Anthony Woods (confidential)
 CMS Audit Supervisors and Managers
 * Diane Geary (supervisory)
 * Doris Green (supervisory)
 * Jane Hewitt (supervisory)
 * George Kotty (supervisory)
 * Suzanne Lewis (supervisory)
 * Brent Nolen (supervisory)
 * John White (supervisory)
 * David Williams (supervisory)
 CMS Bureau of Property Management
 * Greg Owens (confidential)
 * Heather Patterson (confidential)
 * Neil Scott (confidential)
 CMS Group Insurance Division
 * Dan Ewald (supervisory, managerial,
 confidential)
 * Dan Reter (supervisory, managerial,
 confidential)
 CMS Bureau of Communications and
 Computer Services
 * Druanne Allen (managerial)
 CMS Bureau of Administrative Operations,
 Office of Finance and Management
 * Tamara Bartnick (managerial and confidential)
 * Linda Gillespie (managerial)
 * Tammy Compton (managerial)
 CMS Bureau of Communications and
 Computer Services
 * Leslie Barrow (managerial)
 * Beverly Connolly (managerial)
 * Kathie Wilson (managerial)
 Illinois Department of Employment
 Security (IDES) Employees
 * Rex Crossland (supervisory)
 * Roger DuBois (supervisory)
 * Steven Kiolbasa (supervisory)
 * Donald McClain (supervisory)
 * Josephine Jones (supervisory)
 * Drasko Petrusich (confidential)
 * Barton Aplebaum (managerial)
 * Robert Eggebrecht (confidential)
 * Robert Baldridge (supervisory)
 * Curtis Williams (supervisory)
 Illinois Department of Financial and
 Professional Regulation (IDFPR)
 Employees
 * Beverly Bangert (supervisory)
 * Patrick Hyde (supervisory, managerial)
 * George Preski (managerial)
 Department of Human Services (DHS)
 Employees
 * Cheryl Custer (managerial, confidential)
 * Mario Lopez (managerial, confidential)
 * Bernard Miller (managerial)
 * Jamie Nardulli (managerial)
 * Albert Okwiegunam (managerial)
*121
 * Moses Tejuoso (managerial)
 * Theresa Woodcock (supervisory)
 Illinois Department of Public Health
 (Public Health) Employees
 * Ann Geraci (managerial)
 * Theresa McLean (managerial)
 IDOR Employees
 * Vicky Clark (managerial)
 * Brett Lindsey (managerial)
 * Brian Horn (supervisory)
 * Carol Snodgrass (supervisory)
 * Thomas Crouch (supervisory)
 * Tina Towsley (supervisory)
 * Cecil Denton (managerial)
 * JoEllen Mahr (supervisory)
 * Fred Spittler (supervisory)
 * Kathy Clark (supervisory)
 * Ron Rosenfeld (supervisory)
 State Employee Retirement System
 (SERS) Employees
 * Lawrence Stone (managerial)
 * David O'Brien (confidential)
 Illinois State Police Employee
 * Lee Wright (managerial, confidential)
 Illinois Department of Veterans Affairs
 (Veterans Affairs) Employees
 * Trudy Long (managerial, confidential)
 * John McPherson (managerial, confidential)
 * Stephen Obradovich (managerial, confidential)
 * Ray Schneider (managerial, confidential)
 Illinois Department of Health and
 Family Services (IDHFS) Employee
 * Gary Decausemaker (confidential)
 IDNR Employees
 * Guy Beggs (managerial)
 * Janet Davis (supervisory)
 * Truman Scheller (supervisory, managerial,
 confidential)
 Illinois Department of Corrections
 (DOC) Employee
 * Mary Ann Bohlen (supervisory).
¶ 12 In November 2008, the ALJ conducted the oral hearing to determine whether the remaining 44 PSA 2s should be included in the existing bargaining unit. In August 2009, the ALJ issued its recommendation and decision, finding that not a single one of the remaining PSA 2s was a(1) confidential, (2) managerial, or (3) supervisory employee under the Act. The ALJ thereafter recommended that all the disputed PSA 2s be included in the existing bargaining unit. ALJ decision, 25 PERI ¶ 161, at 758. CMS challenged the ALJ's recommendations to the Board.
¶ 13 In November 2009, the Board issued its decision, (1) rejecting CMS's argument that it was entitled to an oral hearing on each of the disputed PSA 2 employees and (2) agreeing with the ALJ that none of the 44 disputed PSA 2s were (a) confidential, (b) managerial, or (c) supervisory employees. 25 PERI ¶ 161, at 737-38. The Board then ordered the impounded ballots opened and tallied. 25 PERI ¶ 161, at 738. The ballots later revealed a vote in favor of AFSCME representation.
¶ 14 This appeal followed.

¶ 15 II. PROLOGUE
¶ 16 Initially, we note that CMS's brief in this case violates Illinois Supreme Court Rule 341(h)(6) (eff. July 1, 2008) (the "Statement of Facts" must "contain the facts necessary to an understanding of the *122 case, stated accurately and fairly without argument or comment" (emphasis added)). When violations of supreme court rules hinder or preclude review, we will strike a brief. Cottrill v. Russell, 253 Ill. App.3d 934, 938, 192 Ill.Dec. 733, 625 N.E.2d 888, 890 (1993).
¶ 17 Although CMS's brief in this case comes close to hindering our review, CMS has nonetheless made sufficient references to representations of facts to allow us to review this case. However, we caution CMS to avoid such violations in future appeals.

¶ 18 III. ANALYSIS
¶ 19 CMS argues that the Board erred by (1) denying it an oral hearing on each of the disputed PSA 2 employees and (2) determining that none of the disputed PSA 2s were (a) confidential, (b) managerial, or (c) supervisory employees under the Act. We address CMS's contentions in turn.
¶ 20 A. CMS's Claim That the Board Erred by Denying It an Oral Hearing on Each of the Disputed PSA 2 Employees
¶ 21 CMS first contends that the Board erred by denying it an oral hearing which CMS claims is a matter of due process of lawon each of the disputed PSA 2 employees. Specifically, CMS asserts that the Board erred when it disregarded its own rules by denying CMS a hearing on each employee, given that its five offers of proof and 3,598 pages of supporting exhibits, containing uncontested facts, justified reasonable cause to allegedly believe that, despite its filings, significant questions existed as to whether each of those employees was confidential, managerial, and supervisory. As to several of CMS's submissions, we agree.

¶ 22 1. The Standard of Review and Procedural Due Process

¶ 23 The article of the Code of Civil Procedure known as the Administrative Review Law, specifically section 3-110 (735 ILCS 5/3-110 (West 2008)), governs judicial review of a Board decision certifying a labor organization as the exclusive bargaining representative of a group of employees. Appeals from such decisions must be made directly to the Illinois Appellate Court. 5 ILCS 315/9(i) (West 2010). According to section 3-110, such appeals "shall extend to all questions of law and fact presented by the entire record." 735 ILCS 5/3-110 (West 2008).
¶ 24 We review the Board's decision to deny an oral hearing for clear error. See Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel, 406 Ill.App.3d 766, 769-70, 348 Ill.Dec. 226, 943 N.E.2d 1136, 1140 (2010) (the Board's decision to deny an oral hearing is reviewed for clear error, noting that the denial of an "oral hearing" is not necessarily the denial of a "hearing" because written arguments could suffice as a hearing in the administrative context). A finding is clearly erroneous if, despite the existence of some evidence to support the finding, the evidence in its entirety leaves the reviewing court with the definite and firm conviction that the finding is a mistake. AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill.2d 380, 393, 261 Ill.Dec. 302, 763 N.E.2d 272, 280-81 (2001).
¶ 25 First, we note that despite CMS's assertion, CMS has no constitutional right to procedural due process. See Department of Central Management Services, 406 Ill.App.3d at 771, 348 Ill.Dec. 226, 943 N.E.2d at 1141 (concluding that the State and its political subdivisions, including CMS, have no constitutional right *123 to due process). Nevertheless, CMS may insist that the Board comply with its own administrative rules. Department of Central Management Services, 406 Ill.App.3d at 771, 348 Ill.Dec. 226, 943 N.E.2d at 1141. Accordingly, we turn to whether the Board complied with its own hearing-procedure rules.

¶ 26 2. The Pertinent Board Rules

¶ 27 Under the Board's rules, an oral hearing, or administrative "trial," is necessary only when "the opposing documents (and any resulting procedural forfeiture) fail to resolve an important question about the petitionor, in the language of the rule, only if `the investigation discloses that there is reasonable cause to believe that there are unresolved issues relating to the question concerning representation.' 80 Ill. Adm.Code § 1210.100(b)(7)(C), as amended by 28 Ill. Reg. 4172, 4192 (eff. February 19, 2004)." Department of Central Management Services, 406 Ill.App.3d at 773, 348 Ill.Dec. 226, 943 N.E.2d at 1143. Therefore, the Board must hold an oral hearing only if it has reasonable grounds for believing that the case presents significant questions that persist despite the parties' written submissions. Department of Central Management Services, 406 Ill.App.3d at 773, 348 Ill.Dec. 226, 943 N.E.2d at 1143. To determine whether reasonable grounds exist for believing that this case presents such questions and therefore whether the Board erred, we examine (1) the statutory right to collectively bargain and (2) CMS's submissions related to the disputed PSA 2s who were denied an oral hearing.

¶ 28 3. The Statutory Right To Organize and Collectively Bargain, and Who Is Excluded

¶ 29 Section 6 of the Act outlines the statutory right of State employees to organize and bargain collectively, in pertinent part, as follows:
"Employees of the State * * * have, and are protected in the exercise of, the right to self-organization, and may form, join or assist any labor organization, to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment * * *." 5 ILCS 315/6(a) (West 2008).
¶ 30 For purposes of the Act, "employees" are defined as "individual[s] employed by a public employer * * *[,] excluding * * * managerial employees; * * * confidential employees; * * * and supervisors." 5 ILCS 315/3(n) (West 2008).
¶ 31 Managerial employees are those employees who are "engaged predominantly in executive and management functions and [are] charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2008).
¶ 32 Confidential employees, on the other hand, are those employees who, "in the regular course of [their] duties, assist[] and act[ ] in a confidential capacity to persons who formulate, determine, and effectuate management policies with regard to labor relations or who, in the regular course of [their] duties, ha[ve] authorized access to information relating to the effectuation or review of the employer's collective[-]bargaining policies." 5 ILCS 315/3(c) (West 2008).
¶ 33 Supervisors are those employees who engage in work that is "substantially different from that of [their] subordinates and who ha[ve] authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine *124 or clerical nature, but requires the consistent use of independent judgment." 5 ILCS 315/3(r) (West 2008).

¶ 34 4. CMS's Submissions Related to the Several Disputed PSA 2s Who Were Denied an Oral Hearing in This Case

¶ 35 In a series of submissions filed between January 2008 and March 2008, CMS outlined, by department, the job descriptions and duties of the following 92 disputed PSA 2s who were later denied an oral hearing.

¶ 36 a. Section Manager, Aging (Rhonda Baer) (Supervisory)
¶ 37 Baer is a section manager of the circuit breaker/pharmaceutical division of Aging, responsible for directing 11 bargaining unit employees and assigning work and creating schedules for those employees. She also reviews her subordinates' work to assure accuracy. Baer completes all performance evaluations and coordinates training for her employees. In addition, Baer is responsible for approving leave requests.

¶ 38 b. CMS Internal Auditors Unit
(Lennel Beaty, MaryJo Behnke, James Bick, Patrick Burns, Jeffery Derrick, James Dickey, Susan Duke, Jennifer Ford-Mitchell, Cornine Fuchs, Kermit Hellrung, Stefanie Kent, Catherine Madonia, Larry Marques, Randy Martin, Dennis McGill, Sudershan Mittal, David Mueth, Jerry Nimmons, Ellen Perry, Terri Rauworth, Daniel Ryan, Edward Schofield, Theodore Tracy, James Walker, John White, and Anthony Woods)

(Confidential)
¶ 39 CMS Internal Auditors Unit is responsible for conducting confidential internal audits of State agencies. In doing so, the auditors follow applicable procedures and standards established by State law. The ethical requirements for this position mandate that the auditors remain independent of "external impairments" to ensure that they act objectively and professionally.

¶ 40 c. CMS Internal Audit Supervisors and Managers

(Diane Geary, Doris Green, Jane Hewitt, George Kotty, Suzanne Lewis, Brent Nolen, and David Williams)

(Supervisory)
¶ 41 CMS Internal Audit supervisors and managers do not have hiring authority but actively participate in staff transfers. They also assign work, direct annual audit plans, and assign audits to their division auditors. The internal audit supervisors and managers (1) schedule overtime, holiday time, and time off, and (2) train, mentor, and monitor subordinates, including imposing discipline.

¶ 42 d. CMS Bureau of Property Management

(Greg Owens, Heather Patterson, and Neil Scott)

(Confidential)
¶ 43 CMS Bureau of Property Management employees are responsible for managing more than 700 facilities throughout the State. Specifically, they oversee payments to vendors and staff, and thus, have prior notice of staffing reductions that could potentially affect bargaining unit staff. These employees report directly to the chief financial officer for property management.

¶ 44 e. CMS Group Insurance Division (Dan Ewald and Dan Reter)

(Supervisory, Managerial, and Confidential)

¶ 45 i. Supervisory

¶ 46 CMS Group Insurance Division employees Ewald and Reter supervise six and *125 eight insurance analysts, respectively. In this capacity, they assign cases, oversee those work assignments, and evaluate their subordinates' work on those assignments. These employees also set performance objectives and conduct performance evaluations on their subordinates.

¶ 47 ii. Managerial

¶ 48 CMS Group Insurance Division employees manage by creating policies that impact their unit and division. Specifically, they draft and revise the group insurance manual and are involved in developing and implementing group insurance policies for sections of the insurance manual.

¶ 49 iii. Confidential

¶ 50 CMS Group Insurance Division employees are consulted prior to (and during) contract negotiations, particularly when those negotiations involve the collective-bargaining agreement and the group insurance statute. These employees play an active role in reviewing the benefits available to members and the way in which those benefits are articulated to members.

¶ 51 f. CMS Bureau of Communications and Computer Services, Appropriations Manager

(Druanne Allen)

(Managerial)
¶ 52 Allen is an appropriations manager with CMS's Bureau of Communications and Computer Services, responsible for administering annual appropriations "through budgetary and expenditure processes, management of budget allocations, application of obligation and expenditure controls, and verification of charges and approval of payments." This employee reports to the division chief and the bureau's chief fiscal officer.

¶ 53 g. CMS Bureau of Administrative Operations/Office of Finance and Management, Budget Analyst

(Tamara Bartnick)

(Managerial and Confidential)

¶ 54 i. Managerial

¶ 55 Bartnick prepares and administers the budget for "the key management offices within CMS." She manages contracts, including invoice approvals and contract compliance. Bartnick also administers funding and fiscal policies for the agreements between CMS, the Governor's office, and other agencies.

¶ 56 ii. Confidential

¶ 57 Bartnick plans the budget for her bureau and administers reductions, additions, changes, and head count for all funds within that bureau. She has access to legal contracts and expenditures related to outside legal representation in all labor and human relations matters. Bartnick also receives confidential details of the legal activities related to labor and human relations issues for CMS and the Governor's office.

¶ 58 h. CMS Bureau of Administrative Operations/Office of Finance and Management, Accounting Division Operations Manager

(Linda Gillespie)

(Managerial)
¶ 59 Gillespie oversees and directs the fiscal operations of the CMS accounting division. In doing so, she creates fiscal policies, including negotiating certain policies and procedures required to meet State standards. Gillespie also speaks on behalf of the bureau and negotiates audit issues with third-party auditors.

*126 ¶ 60 i. CMS Bureau of Communications and Computer Services, Administration and Planning

(Leslie Barrow)

(Managerial)
¶ 61 Barrow is a systems administrator, which requires her to develop and implement policies and procedures for the security of the computer agency's system. She is responsible for entering and deleting all inventory in the system. Barrow handles all changes, including new procedures for the vendor payment system.
¶ 62 j. CMS Bureau of Administrative Operations/Office of Finance and Management, Financial Reporting Manager for the Accounting Division

(Tammy Compton)

(Managerial)
¶ 63 Compton oversees and directs the fiscal operations of the accounting division. In this capacity, she creates fiscal policies and procedures for agency-wide operations, as well as agencies doing business with CMS. Compton has authority to commit agency resources and is a key interface between CMS and external auditors.

¶ 64 k. CMS Bureau of Communications and Computer Services, Administrative Planning

(Beverly Connolly)

(Managerial)
¶ 65 Connolly manages the statistical services revolving fund at CMS. She reports directly to the business services chief, acting as an assistant to the division chief. Connolly is instrumental in establishing procedures for the billing of new rates structures, as well as billings for special projects. Connolly also develops rates and methodologies to properly bill the State for information technology services to recover costs, while preventing overages and audit issues.

¶ 66 l. CMS Bureau of Communications and Computer Services, Administration and Planning

(Kathie Wilson)

(Managerial)
¶ 67 Wilson works on vendor contracts and payments. She has helped develop, process, and enforce the rules that she created in response to changes in Illinois law.

¶ 68 m. IDES Audit and Accounting Supervisors, Financial Operations Experts, and Accounts and Payroll Managers
(Rex Crossland, Roger DuBois, Steven Kiolbasa, Donald McClain, Josephine Jones, Drasko Petrusich, Barton Aplebaum, Robert Eggebrecht, Robert Baldridge, and Curtis Williams)

(Supervisory, Managerial, and Confidential)

¶ 69 i. Supervisory

¶ 70 IDES employees DuBois, Jones, Kiolbasa, McClain, Crossland, Baldridge, and Williams supervise a number of IDES employees. They prepare several written reports and audit findings, spending the majority of their time, however, supervising subordinates. These employees also (a) play a role in hiring new employees and are responsible for training those new hires, (b) issue written and oral reprimands, (c) adjust grievances, and (d) evaluate their subordinates' job performance.

¶ 71 ii. Managerial

¶ 72 IDES employees Aplebaum and Baldridge manage and develop procedures and fees for licenses. These employees also possess final authority to make changes to their respective policies and internal systems.

¶ 73 iii. Confidential

¶ 74 IDES employees Petrusich and Eggebrecht maintain detailed budget information *127 and perform analyses directed by the chief financial officer. These employees have access to budget information that could impact union negotiations and potential strikes.

¶ 75 n. IDFPR Banking, Insurance, and Financial Institutions Divisions

(Beverly Bangert, Patrick Hyde, and George Preski)

(Supervisory and Managerial)

¶ 76 i. Supervisory

¶ 77 IDFPR employees Bangert and Hyde set performance objectives and evaluate their subordinates. They also (a) assign work and direct their subordinates in completing objectives, (b) authorize time off, (c) conduct training, and (d) handle employee complaints.

¶ 78 ii. Managerial

¶ 79 IDFPR employees Hyde and Preski develop and oversee licensing procedures pursuant to various State laws. They also recommend approval of certain processes and develop other internal procedures.

¶ 80 o. DHS Administrative, Budget, Mental Health Division, Fiscal, and Rehabilitative Division Employees
(Cheryl Custer, Mario Lopez, Bernard Miller, Jamie Nardulli, Albert Okwiegunam, Moses Tejuoso, and Theresa Woodcock)

(Supervisory, Managerial, and Confidential)

¶ 81 i. Supervisory

¶ 82 DHS employee Woodcock supervises a staff of 17 employees who process payroll. She develops and implements internal procedures to ensure timely processing of the invoices and payrolls processed in her section. Woodcock also (a) assists in the development of department-level policies and procedures, (b) establishes goals and objectives for subordinate staff, and (c) is responsible for discipline within her unit.

¶ 83 ii. Managerial

¶ 84 DHS employees Custer, Lopez, Miller, Nardulli, Okwiegunam, and Tejuoso (a) develop budget analyses and cost projections for spending plans, (b) review audit findings and coordinate audit reviews, and (c) develop and implement annual budgets. Some of these positions have frequent contact with the Governor's office to discuss budget issues.

¶ 85 iii. Confidential

¶ 86 DHS employees Custer and Lopez review budget options before they become public. Such information is "confidential and embargoed" until the Governor holds the budget address.

¶ 87 p. Public Health Budget Analysts

(Ann Geraci and Theresa McLean)

(Managerial)
¶ 88 Public Health employees Geraci and McLean (a) supervise and assist in formulating the agency's budget, working closely with the Governor's office and (b) prepare financial statements for federal grants, executing "signature control for all federal grant obligations and expenditures," respectively.
¶ 89 q. IDOR Motor Fuel Tax, Local Tax Allocation, Property Tax, Taxpayer Assistance, Central Processing, Customer Service, and Central Registration Divisions
(Vicky Clark, Brett Lindsey, Brian Horn, Carol Snodgrass, Thomas Crouch, Tina Towsley, Cecil Denton, JoEllen Mahr, Fred Spittler, Kathy Clark, and Ron Rosenfeld)

(Supervisory and Managerial)

¶ 90 i. Supervisory

¶ 91 IDOR employees Horn, Snodgrass, Crouch, Towsley, Mahr, Spittler, K. Clark, *128 and Rosenfeld supervise trainees, prioritize work and approve time off for subordinates, and handle discipline of and evaluate subordinates. These employees spend the vast majority of their workday performing these supervisory functions.

¶ 92 ii. Managerial

¶ 93 IDOR employees V. Clark and Lindsey are responsible for the direction of the work performed in their division, using their own judgment and discretion. These employees also spend the vast majority of their workday maintaining staffing, administering oral and written discipline, handling grievances, training employees, approving time off, effectuating the policies and procedures established by the State legislature, and directing management policies.
¶ 94 IDOR employee Denton develops publication and website application for use by the public. He is also a policy maker, responsible for multiple grant programs.

¶ 95 r. SERS Internal Auditor and Administrative Services Division Chief Fiscal Officer

(Lawrence Stone and David O'Brien)

(Managerial and Confidential)

¶ 96 i. Managerial

¶ 97 SERS employee Stone conducts internal audits of the State's employee retirement system, while working closely with the agency director. In this regard, Stone completes reports and makes decisions as to changes that are made to the system.

¶ 98 ii. Confidential

¶ 99 SERS employee and chief fiscal officer O'Brien reports directly to the agency director. He is responsible for planning and preparing the agency budget and budget documents for submission to the Governor's office and the General Assembly. O'Brien also manages, directs, and supervises the activities of the technical staff in the administrative-services division. He establishes goals and objectives for the division, ensuring that his subordinates achieve those goals and objectives.

¶ 100 s. Illinois State Police Budget Analyst

(Lee Wright)

(Managerial and Confidential)

¶ 101 i. Managerial

¶ 102 State Police budget analyst Wright supervises employees and is responsible for department-wide accounting, voucher processing, financial reporting, and asset management. He is a staff advisor to the bureau chief. Wright reviews budget requests and determines whether those items should be included in the department's budget request that is presented to the Governor's office.

¶ 103 ii. Confidential

¶ 104 Wright, as a budget analyst, has access to highly confidential budgetary information, including advance knowledge of possible layoff scenarios for both union and nonunion employees.

¶ 105 t. Department of Veterans Affairs, Veterans Home Administrators

(Trudy Long, John McPherson, Stephen Obradovich, and Ray Schneider)

(Managerial and Confidential)
¶ 106 The veterans affairs and veterans home administrators serve as administrators and managers of the State-run veterans homes. In this capacity, these employees analyze, prepare, and review budgetary projections and proposals for the veterans homes. These analyses include projections for union costs.

*129 ¶ 107 u. IDHFS Personal Services Budget Analyst

(Gary Decausemaker)

(Confidential)
¶ 108 IDHFS personal services budget analyst Decausemaker serves as a budget analyst for the child-support-enforcement budgeting program. In that position, he monitors and forecasts personal-services spending for the child-support-enforcement administrative fund, "costing out" decisions related to hiring and staffing activity such as salary increases, attrition rates, and overtime utilization. Such "cost-outs" could be provided to labor-relations staff to use in contract negotiations.

¶ 109 v. IDNR Accountants, Administrators, and Managers

(Guy Beggs, Janet Davis, and Truman Scheller)

(Supervisory, Managerial, and Confidential)

¶ 110 i. Supervisory

¶ 111 IDNR administrator Davis and manager Scheller supervise a number of subordinates, including, in Davis's case, an employee who had previously been excluded from the union as a supervisor. Davis disciplines and trains subordinates and conducts their performance evaluations.
¶ 112 Scheller is consulted by the labor relations staff and the human resources director regarding the fiscal implications of various contract proposals before such proposals are made at the bargaining table.

¶ 113 ii. Managerial

¶ 114 IDNR chief accountant Beggs maintains, coordinates, and implements the accounting systems and financial reporting for IDNR. He reports directly to IDNR's chief fiscal officer, recommending policy changes. Beggs also participates in writing and revising IDNR's policy on travel.
¶ 115 IDNR manager Scheller also reports directly to IDNR's chief fiscal officer, writing and recommending department policy changes. He is also responsible for all revisions to the department's finance handbook.

¶ 116 iii. Confidential

¶ 117 IDNR manager Scheller supervises 13 subordinates, including Davis. Another one of Scheller's subordinates, an accountant supervisor, has been excluded from the union as supervisory. He has disciplinary authority, with the ability to adjust grievances. Scheller also supervises training for his subordinates, monitors their work production, and conducts their performance reviews.

¶ 118 w. DOC Supervisor of Central Accounting

(Mary Ann Bohlen)

(Supervisory)
¶ 119 DOC supervisor of central accounting Bohlen directly supervises five subordinates and indirectly supervises the accounting staff and business administrations staff in DOC. Bohlen is charged with (a) hiring; (b) assigning and directing work; (c) scheduling time off; (d) training, mentoring, and monitoring; (e) completing performance evaluations, (f) making recommendations for promotion, and (g) disciplining subordinates.

¶ 120 5. CMS's Submissions, the Law, and the Board's Decision

¶ 121 Although we agree that CMS's submissions were insufficient to require an oral hearing as to many of the disputed PSA 2 employees, given CMS's submissions and the oral-hearing standard established by the Board, we nonetheless are left with the definite and firm conviction *130 that the Board erred by denying CMS an oral hearing on the following employees: (1) CMS Bureau of Property Management employees Owens, Patterson, and Scott as confidential; (2) CMS Group Insurance Division employees Ewald and Reter as confidential; (3) CMS Bureau of Administrative Operations/Office of Finance and Management employees (a) Bartnick as managerial and confidential and (b) Compton as managerial; (4) IDES employees (a) DuBois, Jones, Kiolbasa, McClain, Crossland, Baldridge, and Williams as supervisory, and (b) Petrusich and Eggebrecht as confidential; (5) DHS employees (a) Woodcock as supervisory and (b) Custer and Lopez as confidential; (6) IDOR employees (a) Horn, Snodgrass, Crouch, Towsley, Mahr, Spittler, K. Clark, and Rosenfeld as supervisory and (b) V. Clark and Lindsey as managerial; (7) Illinois State Police budget analyst Wright as confidential; (8) Department of Veterans Affairs employees Long, McPherson, Obradovich, and Schneider as confidential; (9) IDNR employees (a) Davis as managerial and (b) Scheller as supervisory (both of whom we note supervise employees who have previously been excluded as supervisory employees); and (10) DOC employee Bohlen as supervisory.
¶ 122 In so concluding, we do not mean to imply that as a matter of law these disputed PSA 2 employees must be excluded from the bargaining unit (see Department of Central Management Services/Illinois Human Rights Comm'n v. Illinois Labor Relations Board, State Panel, 406 Ill.App.3d 310, 316-17, 348 Ill.Dec. 240, 943 N.E.2d 1150, 1156-57 (2010) (concluding that ALJs were managerial employees as a matter of law)). Rather, we conclude on this record only that CMS has demonstrated reasonable grounds for believing that significant questions are raised about these employees' status as supervisory, managerial, or confidential.

¶ 123 B. CMS's Claim That the Board Erred by Determining That the Disputed PSA 2s Were Not Confidential, Managerial, or Supervisory Employees Under the Act
¶ 124 CMS next contends that the Board erred by determining that the disputed PSA 2s were not confidential, managerial, or supervisory employees under the Act. As to the disputed PSA 2 employees who were granted an oral hearing, we agree.
¶ 125 Prior to addressing the substance of CMS's claims in this regard, we note that having previously analyzed CMS's submissions vis-á-vis the 92 disputed employees who were denied an oral hearing, we need not repeat that analysis here. As previously stated, we do not conclude that those PSA 2s who were denied an oral hearing must be excluded from the bargaining unit, only that CMS has demonstrated reasonable grounds for believing that the description submitted of those employees that we have listed presented significant questions about those employees' status as supervisory, managerial, or confidential. Accordingly, we extend our analysis to the remaining 44 disputed PSA 2 employees who had a hearing.

¶ 126 1. The Standards of Review

¶ 127 The particular standard of review we employ when reviewing the Board's findings depends on the nature of the question we are considering. When the question is purely one of fact, we deem the Board's resolution of that question to be "prima facie true and correct" (735 ILCS 5/3-110 (West 2008)), which means those questions are reviewed under the manifest weight of the evidence standard. Carpetland U.S.A., Inc. v. Illinois Department of Employment Security, 201 Ill.2d 351, 369, 267 Ill.Dec. 29, 776 N.E.2d 166, 177 (2002). "A finding is against the manifest weight of the evidence when an opposite conclusion *131 is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." Vancura v. Katris, 238 Ill.2d 352, 374, 345 Ill.Dec. 485, 939 N.E.2d 328, 342 (2010).
¶ 128 When, however, the question is purely one of law, we afford no deference to the Board. Carpetland, 201 Ill.2d at 369, 267 Ill.Dec. 29, 776 N.E.2d at 177. Our review in that circumstance is de novo. Carpetland, 201 Ill.2d at 369, 267 Ill.Dec. 29, 776 N.E.2d at 177.
¶ 129 Sometimes, though, the question cannot be accurately characterized as one purely of fact or purely of law, but is a mixed question of fact and law, in which case we employ an intermediate standard of review. Carpetland, 201 Ill.2d at 369, 267 Ill.Dec. 29, 776 N.E.2d at 177. A mixed question of fact and law is one that involves the examination of the legal effect of a particular set of facts. AFM, 198 Ill.2d at 391, 261 Ill.Dec. 302, 763 N.E.2d at 279. Put another way, "a mixed question is one `in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or * * * whether the rule of law as applied to the established facts is or is not violated.'" AFM, 198 Ill.2d at 391, 261 Ill.Dec. 302, 763 N.E.2d at 279 (quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)). When reviewing these mixed questions, we give a diminished amount of deference by asking whether the Board's decision is clearly erroneous. AFM, 198 Ill.2d at 391, 261 Ill.Dec. 302, 763 N.E.2d at 279. In this context, a finding is clearly erroneous if, despite the existence of some evidence to support the finding, the evidence in its entirety leaves the reviewing court with the definite and firm conviction that the finding is a mistake. AFM, 198 Ill.2d at 393, 261 Ill.Dec. 302, 763 N.E.2d at 280-81. Again, the finding is that the undisputed facts do or do not satisfy the statutory standard, the meaning of which likewise is undisputed. AFM, 198 Ill.2d at 391, 261 Ill.Dec. 302, 763 N.E.2d at 279. If there could be two reasonable but opposing views of whether the facts satisfy the statutory standard, the Board cannot have committed clear error by choosing between those views. Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

¶ 130 2. Employees Excluded From the Statutory Right To Bargain Collectively

¶ 131 As previously explained, section 6 of the Act outlines the statutory right of State employees to organize and bargain collectively. "Employees" are "individual[s] employed by a public employer * * *[,] excluding * * * managerial employees; * * * confidential employees; * * * and supervisors." 5 ILCS 315/3(n) (West 2008).

¶ 132 a. Managerial Employees
¶ 133 Managerial employees are those employees who are "engaged predominantly in executive and management functions and [are] charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2008). Thus, managerial-employee status requires two parts: (1) being "engaged predominantly in executive and management functions" and (2) being "charged with the responsibility of directing the effectuation of [such] management policies and practices." 5 ILCS 315/3(j) (West 2008).
¶ 134 Although the Act does not define "executive and management functions," we have noted that "these functions amount to running an agency or department, such as by establishing policies and *132 procedures, preparing the budget, or otherwise assuring that the agency or department operates effectively." Department of Central Management Services, 406 Ill. App.3d at 774, 348 Ill.Dec. 226, 943 N.E.2d at 1143. In other words, executives and managers run the agency or department by, for example, formulating policies and procedures and preparing the budget. Department of Central Management Services, 406 Ill.App.3d at 774, 348 Ill.Dec. 226, 943 N.E.2d at 1144.
¶ 135 The second part of the statutory definition of managerial employee relates to how the agency or department is run. "A managerial employee not only has the authority to make policy but also bears the responsibility of making that policy happen." Department of Central Management Services, 406 Ill.App.3d at 774-75, 348 Ill.Dec. 226, 943 N.E.2d at 1144. That is, managerial employees do not merely recommend policies or give advice to those higher up the employment chain, "they actually direct the governmental enterprise in a hands-on way." Department of Central Management Services, 406 Ill.App.3d at 775, 348 Ill.Dec. 226, 943 N.E.2d at 1144. The touchstone of such status is the independent authority to establish and effectuate policy. Department of Central Management Services, 406 Ill.App.3d at 775, 348 Ill.Dec. 226, 943 N.E.2d at 1144. However, managerial status can also include those who make "effective recommendations"that is, those employees who make recommendations that are almost always implemented. Department of Central Management Services, 406 Ill.App.3d at 775, 348 Ill.Dec. 226, 943 N.E.2d at 1144-45.

¶ 136 b. Confidential Employees
¶ 137 Confidential employees are those employees who, "in the regular course of [their] duties, assist[ ] and act[ ] in a confidential capacity to persons who formulate, determine, and effectuate management policies with regard to labor relations or who, in the regular course of [their] duties, ha[ve] authorized access to information relating to the effectuation or review of the employer's collective bargaining policies." 5 ILCS 315/3(c) (West 2008).
¶ 138 Section 3(n) of the Act excludes confidential employees from the definition of "employees" to which the Act applies. 5 ILCS 315/3(n) (West 2008). In Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31, 153 Ill.2d 508, 523, 180 Ill.Dec. 288, 607 N.E.2d 182, 189 (1992), the supreme court explained this exclusion as follows:
"The purpose of excluding confidential employees is to keep employees from `having their loyalties divided' between their employer and the bargaining unit which represents them. The employer expects confidentiality in labor[-]relations matters but the union may seek access to the confidential materials to gain a bargaining advantage. [Citation.]"

¶ 139 c. Supervisors
¶ 140 Supervisors are those employees who engage in work that is "substantially different from that of [their] subordinates and who ha[ve] authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment." 5 ILCS 315/3(r) (West 2008). Thus, an individual is a supervisor if all three of the following propositions are true: (1) the individual has principal work *133 substantially different from that of his or her subordinates; (2) the individual has authority on the employer's behalf to perform at least one of the outlined indicia of supervisory authoritynamely, the authority to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or effectively recommend any of those actions; and (3) the individual spends a preponderance of his time in the job performing supervisory tasks. City of Freeport v. Illinois State Labor Relations Board, 135 Ill.2d 499, 512, 143 Ill.Dec. 220, 554 N.E.2d 155, 162 (1990).

¶ 141 3. The Board's Findings Related to the Several Disputed PSA 2s Who Were Granted an Oral Hearing

¶ 142 After hearing evidence from CMS and the unions at an oral hearing, the ALJ made the following findings, which were later adopted by the Board.

¶ 143 a. The Findings as to the Employees CMS Claimed Were Confidential
¶ 144 CMS presented evidence that PSA 2 employees from the IDOR Research Office, IDOR Office of Budget and Planning, IDNR Office of Administration, and IDNR Office of Land Management were confidential employees under the Act. The Board rejected CMS's claim that those PSA 2 employees were confidential and adopted the following findings as to each of those offices.

¶ 145 i. IDOR Research Office

(Ruth Ann Day, Ryan Gallagher, Thomas Regan, Hector Vielma, and Hans Zigmund)

(Confidential)
"[CMS] asserts that the PSA * * * 2 employees in the Research Office * * * are confidential employees under the labor nexus test and the authorized access test. However, starting with the labor nexus test, [CMS] has failed to establish that the PSA * * * 2s in the Research Office, in the regular course of their duties, assist an individual who formulates, determines and effectuates labor relations policy. There is no evidence in the record that * * * the direct superior of the PSA * * * 2s * * * has any involvement with labor relations. [CMS] asserts that because the PSA * * * 2s communicate with `high level decision makers' in the Governor's office, the PSA * * * 2s assist individuals who formulate, determine and effectuate labor relations policy. This assertion is unsupported, as [CMS] did not provide any evidence that these individuals in the Governor's [o]ffice are responsible for [CMS's] labor relations policy or are directly involved in collective bargaining negotiations. Even if the PSA * * * 2s did report to an individual who formulates, determines and effectuates labor relations policy, there is no evidence in the record that the PSA * * * 2s actually assist any individual in a confidential capacity in the regular course of their duties. The PSA * * * 2s have never participated in strategy meetings regarding collective bargaining or contract negotiations and are not privy to confidential documents regarding labor relations.
[CMS] has also failed to establish that the PSA * * * 2s in the Research Office are confidential employees under the authorized access test. As discussed above, there is no evidence that the PSA * * * 2s have access to information concerning sensitive matters arising from [CMS's] collective bargaining strategy. [CMS] asserts that the PSA * * * 2s are privy to the Governor's proposed budget before it is finalized. While the Governor's plans for the upcoming fiscal *134 year's budget is not public information prior to its release, the information does not have any connection to labor relations or collective bargaining negotiations. [CMS] also contends that the PSA * * * 2s may have advance notice of revenue shortfalls and therefore, are aware of potential budget cuts and layoffs. The record does not support this contention. Both Day and Vielma testified that they are not consulted as to how budget deficits should be addressed and they have no knowledge of whether there will be budget cuts or layoffs. The PSA * * * 2s' access to budget information does not establish that they meet the confidential standard." ALJ decision, 25 PERI ¶ 161, at 749.

¶ 146 ii. IDOR Budget and Planning Office

(Lisa Ackerman, and Andy Grapes)

(Confidential)
"[CMS] asserts that Ackerman and Grapes are confidential employees under the labor nexus test and the authorized access test. As for the labor nexus test, [CMS] has failed to show that Ackerman and Grapes, in the regular course of their duties, assist an individual [(Lewis)] who formulates, determines and effectuates [CMS's] labor relations policy. While there is some evidence in the record that Lewis is involved in collective bargaining negotiations, the record is unclear in determining the level of Lewis' participation in [CMS's] labor relations policy and strategy. Lewis has requested information to be used in negotiations from Ackerman and Grapes, but there is no evidence that Lewis is primarily responsible for [CMS's] labor relations matters, that he makes recommendations with respect to labor relations strategy or that he drafts management proposals and counter proposals. Even if Lewis did formulate, determine and effectuate labor relations policy, Ackerman and Grapes do not assist Lewis in a confidential capacity in the regular course of their duties. On a daily basis, Ackerman and Grapes are responsible for developing and monitoring IDOR's budget. * * *
As for the authorized access test, [CMS] asserts that Ackerman and Grapes have access to confidential budget information and have performed cost analyses on [CMS's] collective bargaining proposals and layoff plans. First, there is no evidence in the record that Ackerman has authorized access to [CMS's] collective bargaining policy and strategy. Ackerman's primary duty is to develop and monitor certain aspects of IDOR's budget. She is privy to budget information that is not public, but this does not constitute confidential information as defined by the Act. On one occasion, Ackerman provided Lewis with budget information while he was in collective bargaining negotiations. However, there is no evidence that she has ever had access to collective bargaining proposals, layoff plans or [CMS's] collective bargaining strategy. * * *
Grapes' duties come closer than Ackerman's duties to meeting the confidential standard, but [CMS] still failed to establish that Grapes is a confidential employee under the authorized access test. Like Ackerman, Grapes' primary duty is to develop and monitor certain aspects of IDOR's budget. He is privy to budget and salary information that is not public, but this does not constitute confidential information as defined by the Act. Grapes has provided cost analyses on [CMS's] proposals and layoff plans, but simply providing financial data does not establish an employee is confidential as defined by the Act. *135 Grapes has never participated in collective bargaining negotiations or attended a meeting in which collective bargaining strategy was discussed. He has no knowledge of or input into [CMS's] collective bargaining strategy. When performing the cost analyses, Grapes has no knowledge as to whether the proposals will be shared with the union. As for layoff plans, Grapes has no knowledge as to whether the layoffs will actually occur and has no input into whether layoffs should occur." Id. at 750.

¶ 147 iii. IDNR Office of Administration Terry Von Bandy (Confidential)

"[CMS] contends that Bandy is a confidential employee because he has direct contact with individuals who formulate, determine and effectuate labor relations policy and he has access to confidential labor relations policy. Starting with the labor nexus test, [CMS] did not establish that Bandy assists, in a confidential capacity in the regular course of his duties, an individual who formulates, determines and effectuates labor relations policy. While Bandy frequently meets with * * * IDNR's Chief Financial Officer and Human Resources Specialist * * *, direct contact with these individuals does not establish Bandy is a confidential employee under the labor nexus test. The record does not establish that [the CFO and HR specialist] formulate, determine and effectuate labor relations policy. [CMS] did not provide any examples to show that either [the CFO or HR specialist] have primary responsibility for labor relations matters, make recommendations with respect to collective bargaining strategy or draft management proposals or counterproposals.
Moreover, Bandy does not assist any individual in a confidential capacity in the regular course of his duties, as he is primarily responsible for monitoring fiscal operations and making budget recommendations. Bandy has never been present for collective bargaining strategy meetings or negotiations. While he makes budget recommendations regarding operating procedures, his recommendations involve general administrative concerns instead of collective bargaining matters. When [the HR specialist] consulted with Bandy about a grievance, he provided her with budget information as to what [IDNR] could afford. Bandy does not have input into how grievances should be resolved and does not assist with grievances in the regular course of his duties. * * *
[CMS] has also failed to show that Bandy is a confidential employee under the authorized access test. While Bandy is privy to personnel records, staffing needs, and [IDNR's] long range strategic plans, this is not considered to be confidential information as defined by the Act. [CMS] asserts that Bandy's involvement in resolving grievances establishes that he has access to confidential labor relations information, but as discussed above, the evidence indicates that he simply provides budget information to [the HR specialist]. Bandy has never participated in strategy meetings regarding collective bargaining or contract negotiations or been privy to confidential documents regarding labor relations. He has no knowledge of or input into [CMS's] collective bargaining strategy." Id.

¶ 148 iv. IDNR Office of Land Management

(Jeffery Oxencis)

(Confidential)
"[CMS] contends that Oxencis is a confidential employee because he has *136 direct contact with individuals who formulate, determine and effectuate labor relations policy and he has access to confidential documents regarding labor relations. Under the labor nexus test, [CMS] failed to establish that [his supervisor] formulates, determines and effectuates [CMS's] labor relations policy. [His supervisor] has no input into whether a collective bargaining proposal will be accepted or whether a layoff plan will be implemented. [That supervisor] does not have primary responsibility for [CMS's] collective bargaining plans, nor does he participate in collective bargaining negotiations or draft management proposals and counterproposals.
Even if [Oxencis' supervisor] did formulate, determine and effectuate [CMS's] labor relations policy, Oxencis does not assist [his supervisor] in a confidential capacity in the regular course of his duties. Oxencis' primary responsibilities include paying bills, monitoring the budget of the Office of Land Management and making budget recommendations to [his supervisor]. Oxencis has performed cost analyses on collective bargaining proposals and layoff plans, but he does not do so in the regular course of his duties. Moreover, simply providing financial data for use in collective bargaining negotiations does not establish that an employee meets the confidential standard. * * *
Under the authorized access test, Oxencis, in the regular course of his duties, does not have authorized access to information concerning sensitive matters regarding [CMS's] collective bargaining strategy. Oxencis has regular access to the Office of Land Management's budget and salary information, but this does not constitute confidential information as defined by the Act. Oxencis may conduct cost analyses on collective bargaining proposals and layoff plans, but, as discussed above, merely supplying this information does not establish that Oxencis is a confidential employee. He has no knowledge of or input into [CMS's] collective bargaining strategy. All of the information Oxencis receives is from [his supervisor], who himself is not directly involved in collective bargaining negotiations or strategy." Id. at 750-51.

¶ 149 b. The Findings as to the Employees CMS Claimed Were Managerial
¶ 150 CMS presented evidence that PSA 2 employees from the IDOR Office of Publication Management were managerial employees under the Act. The Board rejected CMS's claim that those PSA 2 employees were managerial and made the following findings as to that office.

¶ 151 i. IDOR Office of Publication Management

(Virginia Bartletti, Teresa Blauvelt, Beau Elam, Candace Erwin, Vickie Harvey, Sheri Hoff, Teresa Richards, Jennifer Schwitek, Julie Southwell, and Susan Spada)

(Managerial)
"[CMS] asserts that the [IDOR Office of Publication Management employees] are managerial employees because they are responsible for developing and revising all publications used by IDOR. However, the record does not establish that [those employees] are predominantly involved in executive and management functions. [They] do not run an agency or department, oversee operations or have any involvement in preparing budgets. [CMS] contends that the [employees] formulate policy and procedure and therefore, meet the managerial standard. However, this contention is unsupported *137 because the [employees] do not independently formulate policy and procedure. There are no examples in the record of incidents in which the [employees] themselves have formulated a policy or procedure. Instead, the [employees] act in a subordinate and administrative manner, working to accurately articulate, in IDOR documents, policies that have already been formulated. For most assignments, the [employees] consult with [others] as to the policy and how it should be expressed in the document. The only assignments for which the [employees] do not consult with [others] are those that involve minor modifications such [as] an address change. When involved in an assignment, the [other employees] must sign off on the final product and in some cases [other supervisors] must also approve the final product. * * *
[CMS] has also failed to show that the [employees] meet the second prong of the managerial test, that they exercise responsibility for the effectuation of management policy or oversee policy implementation. As discussed above, the [employees] do not independently formulate policy and therefore, they do not have final responsibility to implement and effectuate policy. Most of the documents drafted by the [employees] are reviewed and amended by [others]. In some cases, the documents are also reviewed and amended by [supervisors], the respective Division Manager or the IDOR 1040 Committee. The [employees] do not exercise responsibility for the effectuation of management policy and functions.
Even those [employees] with unique responsibilities, such as Erwin, Blauvelt and Hoff, do not meet the Act's managerial standard. On the integrated tax project, [one of the supervisors] serves on the process[-]flow team and the correspondence team with the [employees]. Erwin's office is not located in the [Publication Management] office, but she regularly comes back to [that office] to discuss problems with [her supervisors]. The fact that Blauvelt meets with the employees in the Customer Service Bureau does not establish that she has managerial authority. All suggestions from the Customer Service Bureau go through [another] process. Moreover, Blauvelt provides [her supervisor] with her responses to the Customer Service Bureau's inquiries. Finally, Hoff has discretion to determine website content, but she is not actually establishing policy. She places documents on the website only after they have gone through [another] process. [The supervisor] reviewed the most recent website application that Hoff created." Id. at 751-52.

¶ 152 c. The Findings as to the Employees CMS Claimed Were Supervisory
¶ 153 CMS presented evidence that PSA 2 employees from the IDOR Motor Vehicle Use Tax Division, IDOR Sales Tax Division, IDOR Document, Control, and Deposit Division, IDOR Individual Processing Division, IDOR Excise Tax Division, IDOR Taxpayer Assistance Division (Chicago and statewide), and IDOR Business Processing Division were supervisory employees under the Act. The Board rejected CMS's claim that those PSA 2 employees were supervisory and made the following findings as to each of those offices.

¶ 154 i. IDOR Motor Vehicle Use Tax Division

(Mary Green)

(Supervisory)
"[CMS] asserts that Green is a supervisor as defined by the Act, in that her *138 principal work is substantially different from that of her subordinates, she has authority to discipline and direct her subordinates with independent judgment and she devotes a preponderance of her employment time to exercising that authority. As for the first prong, Green manages operations at the [s]ection's four locations and oversees the work of 11 subordinates. Green serves as Assistant Division Manager and may act as Division Manager in [her supervisor's] absence. Green fills in for [supervisors] for lunches and breaks and assists with balancing revenues, but otherwise she does not perform the same duties as the [supervisors]. On the whole, the record establishes that Green's principal work is visibly and obviously different from the principal work of her subordinates.
However, [CMS] failed to establish that Green disciplines her subordinates with independent judgement. First, [her supervisor's] involvement in every step of the disciplinary process limits Green from exercising discretion to decide whether to issue discipline. [Her supervisor] is aware of all pre-disciplinary meetings. While [her supervisor] does not sign off on oral reprimands and written reprimands before they are issued, he reviews documentation of all oral reprimands and written reprimands that are issued by Green. [Her supervisor] is aware of any situation involving a cash shortage because he reports all incidents involving cash shortages to Internal Affairs. In addition, the record is unclear in explaining how Green determines what level of discipline to issue. There is no evidence in the record to determine what happens at the pre-disciplinary meeting and how the meeting results in a certain level of discipline. [CMS] failed to address what Green does with the information she collects at a pre-disciplinary meeting, whether she discusses it with [her supervisor] or makes an independent determination as to what level of discipline is appropriate. For cash shortages that have been investigated by Internal Affairs, Internal Affairs makes a recommendation for the appropriate discipline. There is no evidence that Green has discretion to overrule Internal Affairs' recommendation. Green does not discipline her subordinates with independent judgment.
[CMS] contends that Green has authority to direct with independent judgment because she assigns work, schedules work shifts and completes performance evaluations. However, [CMS] failed to establish that Green has authority to direct as defined by the Act because there is no evidence that she possesses the necessary discretion to affect the terms and conditions of her subordinates' employment in areas such as discipline, transfer, promotion or hire. As for discipline, Green, as discussed above, does not exercise supervisory authority under the Act. With regard to transfer, promotion and hire, there is no evidence that Green has authority to transfer, promote or hire subordinates, or that she can effectively recommend such action. Green has participated in interviewing * * * candidates, but a Human Resources Specialist was present in all interviews and rated the candidates with Green.
Furthermore, Green's ability to conduct performance evaluations is not evidence of supervisory authority to direct. There is no evidence in the record that performance evaluations completed by Green impact her subordinates' terms and conditions of employment. Green has never withheld a pay increase due to poor performance, granted a bonus due to good performance or recommended *139 that [a] * * * [t]rainee not be certified. Because [CMS] failed to show that Green has discretion to affect the terms and conditions of her subordinates' employment, Green does not exercise authority to direct as defined by the Act.
Green does not perform any of the 11 supervisory indicia with independent judgment and therefore, Green does not devote a preponderance of her employment time to exercising supervisory authority." Id. at 753.

¶ 155 ii. IDOR Sales Tax Division

(Chet Billows, Mitzi Brandenburg, and Susan Lonzerotti)

(Supervisory)
"[CMS] asserts that Section Managers Billows, Brandenburg and Lonzerotti are supervisors as defined by the Act because their principal work is substantially different from that of their subordinates, they have authority to direct and discipline with independent judgment and they devote a preponderance of their employment time to exercising that authority. As for the first prong, the Section Managers oversee operations in their respective sections, make assignments, approve time off and complete performance evaluations. Brandenburg monitors the work of 12 subordinates and Lonzerotti monitors the work of 13 subordinates. The Section Managers' principal work is visibly and obviously different from the principal work of their subordinates.
However, [CMS] did not show that the Section Managers discipline their subordinates with independent judgment. One incident in which Lonzerotti counseled two of her subordinates for productivity problems is the only example in the record of the Section Managers' disciplinary authority. There is no evidence that the Section Managers conduct pre-disciplinary hearings, issue documented oral reprimands, issue written reprimands[,] or recommend more severe discipline. The Section Managers do not discipline with independent judgment as required by the Act.
[CMS] asserts that the Section Managers have authority to direct with independent judgment because they assign work, monitor subordinates, approve time off and complete performance evaluations. However, there is no evidence that the Section Managers possess the necessary discretion to affect the terms and conditions of their subordinates' employment in areas such as discipline, transfer, promotion[,] or hire. There is no evidence in the record that the Section Managers discipline, transfer, promote[,] or hire subordinates, or that they can effectively recommend such action.
Moreover, the Section Managers' ability to conduct performance evaluations does not establish that they have authority to affect the terms and conditions of their subordinates' employment. In most cases, [their supervisor] reviews the evaluations * * * before the evaluations are presented to the employees. [That supervisor] instructed Lonzerotti to add a comment to at least one evaluation. There is no evidence in the record that the Section Managers' [sic.] have ever recommended that an employee not receive a pay increase because of poor performance. Even if a Section Manager recommended that a pay increase be withheld, the recommendation would have to be approved by [that section manager's supervisor]. * * *
Finally, [CMS] failed to establish that the Section Managers perform any of the 11 supervisory indicia with independent judgment and therefore, the Section *140 Managers do not devote a preponderance of their employment time to exercising supervisory authority." Id. at 754.

¶ 156 iii. IDOR Document, Control, and Deposit Division

(Joseph Terry Emmett)

(Supervisory)
"[CMS] asserts that * * * Emmett is a supervisor as defined by the Act, in that his principal work is substantially different from that of his subordinates, he has authority to discipline and direct his subordinates with independent judgment and he devotes a preponderance of his employment time to exercising that authority. As for the first prong, Emmett manages operations in his [s]ection, oversees the work of seven subordinates, approves time off and conducts performance evaluations. [Those] in Emmett's [s]ection are responsible for researching tax returns and responding to taxpayer correspondence. Emmett's principal work is visibly and obviously different from the principal work of his subordinates.
As for discipline, Emmett has counseled employees and issued letters of counseling, but counseling does not constitute discipline as defined by the Act. In all other disciplinary incidents described in the record, Emmett did not exhibit the necessary discretion to decide whether to issue discipline. Emmett either consulted with a superior prior to issuing the discipline or was instructed to issue discipline by a superior. Emmett discussed the situation with [his superior] and Labor Relations prior to issuing oral reprimands to two subordinates. As for written reprimands, on one occasion, * * * Emmett's superior * * * instructed Emmett to discipline a subordinate and on another occasion, the Personnel Office directed Emmett to give his subordinate a written reprimand. [CMS] failed to establish that Emmett disciplines with independent judgment as required by the Act.
[CMS] also asserts that Emmett has authority to direct with independent judgment, as he assigns and monitors work, evaluates employees and approves time off. However, [CMS] failed to establish that Emmett has authority to direct as defined by the Act because there is no evidence that he possesses the necessary discretion to affect the terms and conditions of his subordinates' employment in areas such as discipline, transfer, promotion or hire. As for discipline, Emmett, as discussed above, does not exercise supervisory authority under the Act. With regard to hire, transfer and promotion, there is no evidence that Emmett has authority to hire, transfer or promote subordinates, or that he can effectively recommend such action.
Furthermore, Emmett's ability to conduct performance evaluations is not evidence of supervisory authority to direct because the evaluations do not affect the terms and conditions of his subordinates' employment. The evaluations completed by Emmett are reviewed by [his supervisor, and his supervisor's supervisor], prior to Emmett presenting them to his employees. Emmett has never recommended that a subordinate's pay increase be denied due to work performance issues. If Emmett ever did recommend that his subordinate not receive a pay increase, the Personnel Office would have to approve the recommendation. Because [CMS] failed to establish that Emmett has discretion to affect the terms and conditions of his subordinates' *141 employment, Emmett does not exercise supervisory authority to direct.
Emmett does not perform any of the 11 supervisory indicia with independent judgment and therefore, he does not devote a preponderance of his employment time to exercising supervisory authority." Id. at 754.
¶ 157 iv. IDOR Individual Processing Division

(Paula Hamrock, Monica Marchizza, Dottie Perkins, Cathy Scott, and Sheila Washburn)
(Supervisory)
"[CMS] asserts that Section Managers Hamrock, Marchizza, Perkins, Scott and Washburn exercise supervisory authority in that their principal work is substantially different from that of their subordinates, they have authority to discipline, adjust grievances and direct with independent judgment and they devote a preponderance of their employment time to exercising that authority. As for the first prong, the parties stipulated that Hamrock, Marchizza, Perkins and Washburn perform principal work that is substantially different from the principal work of their subordinates. Scott oversees operations of the Quality Assurance Section, monitors the work of seven subordinates, approves time off and completes performance evaluations. [Others] in Scott's division perform quality review for the entire Individual Processing Division. While Scott performs quality review on a certain percentage of her subordinates' work, she is checking her subordinates' work, not the work of other sections in the [d]ivision. This is only one of her many responsibilities. Scott's principal work is visibly and obviously different from the principal work of her subordinates.
[CMS] asserts that the Section Managers' disciplinary authority constitutes supervisory authority under the Act. However, the evidence indicates that the Section Managers lack the necessary discretion to determine whether to issue discipline. The Section Managers may independently counsel a subordinate, but this does not constitute discipline as defined by the Act. Prior to issuing an oral reprimand, the Section Managers present documentation of the employee's misconduct to [another] and sometimes Labor Relations. The oral reprimands are recorded in the employee's personnel file, but the involvement of [others] prevents the Section Managers from exercising independent judgment when determining whether to issue discipline. There is no evidence in the record that the Section Managers issue written reprimands or recommend more severe discipline. The Section Managers do not discipline with independent judgment.
Next, [CMS] asserts that the Section Managers' ability to adjust grievances constitutes supervisory authority as defined by the Act. In the one example in the record of a grievance presented to a Section Manager, Washburn denied the grievance and forwarded it to the second level. There is no evidence that a Section Manager has ever resolved a grievance. Therefore, the Section Managers do not adjust grievances with independent judgment.
[CMS] asserts that the Section Managers have authority to direct with independent judgment because they assign work, monitor the productivity of their subordinates, approve time off and complete performance evaluations. However, there is no evidence that the Section Managers possess the necessary discretion to affect the terms and conditions of their subordinates' employment in areas such as discipline, transfer, promotion or *142 hire and therefore, [CMS] failed to establish that the Section Managers have authority to direct as defined by the Act.
The ability of the Section Managers to conduct performance evaluations does not establish that they have supervisory authority to direct because the evaluations do not affect the terms and conditions of their subordinates' employment. [A supervisor] reviews the evaluations completed by the Section Managers to ensure the ratings are properly supported before the evaluations are presented to the employees. There are no examples of the Section Managers effectively recommending that a subordinate's pay increase be withheld. Moreover, when evaluating * * * [t]rainees, the record indicates that the Section Managers discuss the employee's performance with [their supervisor] and provide her with documentation of the employee's performance prior to recommending that an employee should be terminated instead of promoted and certified. A Section Manager's recommendation to terminate [a] * * * [t]rainee must also be approved by Labor Relations. The Section Managers do not exercise authority to direct as defined by the Act.
Finally, the Section Managers do not perform any of the 11 supervisory indicia with independent judgment and therefore, the Section Managers do not devote a preponderance of their employment time to exercising supervisory authority." Id. at 754-55.
¶ 158 v. IDOR Excise Tax Division

(Brock Reynolds and Brian Spelman)
(Supervisory)
"[CMS] asserts that Section Managers Reynolds and Spelman are supervisors, in that their principal work is substantially different from that of their subordinates, they have authority to discipline and direct with independent judgment and they devote a preponderance of their employment time to exercising that authority. As for the first prong, the Section Managers oversee the operations of their respective sections, monitor the work of their subordinates, approve time off and complete performance evaluations. [The subordinates] in the Excise Tax Division process tax returns and correspond with taxpayers. While the Section Managers know how to perform the work of their subordinates, they do not perform that work on a regular basis. The Section Managers' principal work is visibly and obviously different from the principal work of their subordinates.
However, the record does not establish that the Section Managers discipline their subordinates with independent judgment. The Section Managers may independently counsel a subordinate and document the counseling in the employee's personnel file, but this does not constitute discipline under the Act. There is no evidence that the Section Managers have discretion to independently determine whether discipline is warranted, as [testimony showed] that the Section Managers usually discuss discipline with [others] prior to issuing it. If the Section Managers do not discuss discipline with [others] prior to issuing it, they inform [them] of the discipline after it is issued. Reynolds has issued oral reprimands and written reprimands for attendance violations, but there is no evidence in the record to establish how Reynolds determines which level of discipline to issue, whether he holds a pre-disciplinary meeting, is directed by a superior to issue the discipline or makes an independent decision. There are no examples of Section Managers *143 recommending discipline more severe than a written reprimand. There are no examples of Spelman's involvement in disciplinary issues. There is not enough evidence in the record to establish that the Section Managers' authority to discipline constitutes supervisory authority as defined by the Act.
[CMS] also asserts that the Section Managers have authority to direct with independent judgment because they assign work, oversee subordinates, schedule work hours, approve time off and conduct performance evaluations. However, [CMS] failed to establish that the Section Managers have authority to direct as defined by the Act because there is no evidence that they possess the necessary discretion to affect the terms and conditions of their subordinates' employment in areas such as discipline, transfer, promotion or hire. As for discipline, the Section Managers do not exercise supervisory authority under the Act. There is no evidence in the record that the Section Managers transfer, promote or hire subordinates, or that they can effectively recommend such action.
The ability of the Section Managers to complete performance evaluations does not establish that they have authority [to] affect the terms and conditions of their subordinates' employment. The evaluations completed by the Section Managers do not impact wage increases. The record indicates that the Section Managers rarely recommend that a subordinate's semi-automatic promotion * * * be withheld due to poor performance. A Section Manager in the Excise Tax Division most recently recommended that a semi-automatic promotion be withheld in 1999. The Section Managers' recommendations regarding promotions first must be approved by [a supervisor] and then go up the chain of review to [that person's superiors]. The Section Managers do not have discretion to impact the terms and conditions of their subordinates' employment, and therefore, they do not exercise authority to direct.
[CMS] failed to establish that the Section Managers perform any of the 11 supervisory indicia with independent judgment and therefore, the Section Managers do not devote a preponderance of their employment time to exercising supervisory authority." Id. at 755-56.
¶ 159 vi. IDOR Taxpayer Assistance Division (Chicago)

(Mike Mikels)
(Supervisory)
"[CMS] asserts that Mikels exercises supervisory authority in that his principal work is substantially different from the principal work of his subordinates, he has authority to discipline and direct his subordinates with independent judgment and he devotes a preponderance of his employment time to exercising that authority. As for the first prong, Mikels manages operations in the Taxpayer Assistance Division in Chicago, oversees the work of 13 subordinates, schedules work hours, makes assignments and completes performance evaluations, in contrast, [his subordinates] assist taxpayers who walk-in and call the office with tax questions. Mikels monitors [the subordinates'] work, to ensure they are providing accurate information to taxpayers, but he does not interact with taxpayers on a regular basis. Mikels' principal work is visibly and obviously different from the principal work of his subordinates.
[CMS] contends that Mikels disciplines with independent judgment, however there is no evidence that Mikels *144 even counsels his employees without consulting a superior. In the one incident in the record in which Mikels counseled a subordinate, Mikels discussed the situation with [his superior] prior to the counseling. There is no evidence that Mikels issues oral reprimands or written reprimands or recommends subordinates for more severe discipline. [CMS] failed to establish that Mikels has authority to discipline with independent judgment as required by the Act.
[CMS] also asserts that Mikels has authority to direct with independent judgment, as he assigns and monitors work, approves time off and evaluates employees. However, there is no evidence that Mikels possesses the necessary discretion to affect the terms and conditions of his subordinates' employment in areas such as discipline, transfer, promotion or hire. Furthermore, Mikels' ability to conduct performance evaluations does not establish that he has authority to affect the terms and conditions of his subordinates' employment. The evaluations completed by Mikels do not impact his subordinates' wages. There are no examples in the record of incidents in which Mikels, as part of an employee's evaluation, recommended that the employee not receive a semi-automatic promotion. At the time of the hearing, Mikels had concerns about whether to promote one of his * * * [t]rainees. [Two other employees] were both aware of the situation even though Mikels had yet to make a recommendation with regard to the employee. This evidence indicates that [the other employees] are involved in these decisions, limiting Mikels' ability to exercise independent judgment. Mikels' ability to complete performance evaluations and make recommendations as to * * * [t]rainees does not establish that he has supervisory authority to direct.
[CMS] asserts that the performance evaluations completed by Mikels do impact the terms and conditions of his subordinates' employment because Mikels reviewed past performance evaluations when determining which [subordinates] should be promoted * * *. While Mikels based his recommendation to promote the less senior employee on the employees' performance evaluations, there is no evidence in the record that Mikels' recommendation was effective. The record indicates that [other employees] were involved in the decision but is unclear in determining the degree to which they relied on Mikel's recommendation. Moreover, the evidence does not establish who actually made the final decision to promote the individual. Looking at the record as a whole, this one incident does not show that Mikels has authority to independently affect the terms and conditions of his subordinates' employment. Mikels does not exercise authority to direct as defined by the Act.
Mikels does not perform any of the 11 supervisory indicia with independent judgment and therefore, Mikels does not devote a preponderance of his employment time to exercising supervisory authority." Id. at 756.
¶ 160 vii. IDOR Taxpayer Assistance Division (Statewide)

(Linda Bennett, Denise Byrne, Sherry Sampson, Janine Stroble, Claire Tegtman, and Jim Walkington)
(Supervisory)
"[CMS] asserts that the Section Managers in the Taxpayer Assistance Division, Bennett, Byrne, Sampson, Stroble, Tegtman, Walkington, are supervisors as defined by the Act, in that their principal *145 work is substantially different from that of their subordinates, they have authority to discipline, adjust grievances and direct with independent judgment and they devote a preponderance of their employment time to exercising that authority. As for the first part of the supervisory test, the Section Managers oversee their respective sections, monitor subordinates, schedule, approve time off and complete performance evaluations. In contrast, most of the [subordinates] in the Taxpayer Assistance Division answer questions from taxpayers in either the call center or one of the division's walk-in locations. The [subordinates] in the Taxpayer Correspondence Section perform adjustments on taxpayer accounts. The Section Managers may assist the [subordinates] with complicated problems, but otherwise they do not perform the duties of the [subordinates]. The Section Managers' principal work is visibly and obviously different from the principal work of their subordinates.
There is little evidence in the record to support [CMS's] contention that the Section Managers discipline with independent judgment. The Section Managers' ability to independently counsel their subordinates does not constitute discipline under the Act. The Section Managers do not have independent discretion to determine whether to discipline, as they usually consult [a supervisor] before issuing oral reprimands and written reprimands. [That supervisor] was aware of the circumstances surrounding all oral reprimands in the record issued by Stroble. Walkington conducted a pre-disciplinary meeting to address [an employee's] tardiness, but he spoke with [his supervisor] prior to issuing a written reprimand to [that employee]. There are no examples in the record in which a Section Manager acted with independent judgment when issuing discipline to a subordinate. Therefore, the Section Managers do not have authority to discipline with independent judgment.
Next, [CMS] asserts that the Section Managers' ability to adjust grievances constitutes supervisory authority as defined by the Act. When a grievance was presented to Walkington, he denied the grievance and forwarded it to [his supervisor], who resolved the grievance. There is no evidence in the record that a Section Manager has ever resolved a grievance. Therefore, the Section Managers do not adjust grievances as defined by the Act.
[CMS] asserts that the Section Managers have authority to direct with independent judgment because they assign work, monitor and evaluate their subordinates and approve time off. However, there is no evidence that the Section Managers possess the necessary discretion to affect the terms and conditions of their subordinates' employment in areas such as discipline, transfer, promotion or hire. As for discipline, the Section Managers, as discussed above, do not exercise supervisory authority under the Act. There is no evidence in the record that the Section Managers transfer, promote or hire subordinates, or that they can effectively recommend such action.
The ability of the Section Managers to evaluate subordinates does not constitute supervisory authority as defined by the Act. Evaluations completed by the Section Managers do not affect the terms and conditions of their subordinates' employment. While the Section Managers may recommend that a subordinate be certified or that a semi-automatic promotion be denied, there is no evidence that * * * such a recommendation [has been made] without first *146 consulting with a superior. Tegtman recommended that [a subordinate] not receive a semi-automatic promotion * * *, but only after discussing [that employee's] work performance with [a supervisor]. The Section Managers do not have discretion to independently impact the terms and conditions of employment of their subordinates and therefore, do not exercise authority to direct as defined by the Act.
Finally, [CMS] failed to establish that the Section Managers perform any of the 11 supervisory indicia with independent judgment and therefore, the Section Managers do not devote a preponderance of their employment time to exercising supervisory authority." Id. at 757.
¶ 161 viii. IDOR Business Processing Division

(Kevin Anguish, Mary Austin, Donna Mast, Matt Smith, Shirley McGlennon, and Brenda Cawley)
(Supervisory)
"[CMS] asserts that the Section Managers in the Business Processing Division * * * are supervisors because their principal work is substantially different from that of their subordinates, they have authority to discipline and direct with independent judgment and they devote a preponderance of their employment time to exercising that authority. The Section Managers oversee their respective sections and subordinates, make assignments, perform quality review and conduct performance evaluations. In contrast, the [subordinates] in the Business Processing Division process tax returns and respond to taxpayer correspondence. The Section Managers may perform the same duties as the [subordinates] if needed, but do not do so on a daily basis. The principal work of the Section Managers is visibly and obviously different from the principal work of their subordinates.
[CMS] asserts that the Section Managers discipline with independent judgment because they determine when discipline is warranted and counsel their subordinates for inappropriate conduct. However, the record does not support this assertion, as it describes only one incident in which a Section Manager was involved in issuing discipline. Smith counseled two of his subordinates, but only after discussing their conduct with [other employee and a supervisor]. This one example does not establish that the Section Managers have authority to discipline with independent judgment.
[CMS] asserts that the Section Managers have authority to direct with independent judgment because they assign work, monitor the productivity of their subordinates, and complete performance evaluations. However, [CMS] failed to establish that the Section Managers have authority to direct because there is not evidence that they possess the necessary discretion to affect the terms and conditions of their subordinates' employment in areas such as discipline, transfer, promotion or hire. As for discipline, the Section Managers, as discussed above, do not exercise supervisory authority under the Act. There is no evidence in the record that the Section Managers transfer, promote or hire subordinates, or that they can effectively recommend such action.
Moreover, the ability of the Section Managers to conduct performance evaluations and make recommendations as to * * * [t]rainees does not establish that they have supervisory authority to affect the terms and conditions of their subordinates' employment. [The Section Managers' supervisor] reviews the evaluations *147 completed by the Section Managers before they are presented to the employees, to ensure the ratings are properly documented and supported. If [that supervisor] believes a rating should be changed, the Section Manager must amend the evaluation and give it back to [the supervisor] for a second review. Mast spoke with [that supervisor] prior to recommending that [a t]rainee * * * be terminated. [The supervisor] and Mast met with [another employee], Labor Relations and Personnel to discuss [that trainee's] performance. There is no evidence that the decision to terminate [that trainee] was solely the result of Mast's recommendation. There are no examples in the record in which a Section Manager's recommendation on an evaluation impacted a subordinate's terms and conditions of employment. Therefore, the Section Managers do not exercise authority to direct as defined by the Act.
The Section Managers do not perform any of the 11 supervisory indicia with independent judgment and therefore, the Section Managers do not devote a preponderance of their employment time to exercising supervisory authority." Id. at 756-57.

¶ 162 4. The Standard of Review as Applied to the Board's Adopted Findings

¶ 163 Similar to the Board's findings related to the denial of an oral hearing as to several PSA 2 employeeswhich we have concluded was erroneouswe are likewise left with the definite and firm conviction that its findings were a mistake as to the 44 PSA 2s who were granted an oral hearing.
¶ 164 First, we note that neither party challenges the Board's factual descriptions as to any of the disputed PSA 2 employees. Instead, the parties assert only that the Board erred or did not err, respectively, when it applied the Act to those factual descriptions.
¶ 165 We have reviewed the Board's decisions in light of the deferential clear-error standard that applies here, but we can suspend our disbelief only so far. Following the Seventh Circuit's observation in a case that also involved deferential review, our review of the Board's decision for clear error in this case, while deferential, is not completely supine. Thompson v. Altheimer & Gray, 248 F.3d 621, 624-25 (7th Cir.2001). Even in light of the clearly erroneous standard of review, we are compelled to conclude that the Board erred by finding that the PSA 2 employees should not be excluded from the bargaining unit under the Act. Specifically, we conclude that the Board erred by applying the job descriptions of the PSA 2s to its own recharacterized standardswhich are not the standards required under the Actas follows.

¶ 166 a. The Confidential PSA 2 Employees

¶ 167 i. IDOR Research Office

(Ruth Ann Day, Ryan Gallagher, Thomas Regan, Hector Vielma, and Hans Zigmund)

(Confidential)
¶ 168 The Board included the IDOR Research Office PSA 2s in the RC-62 bargaining unit because it concluded that they were not confidential employees for purposes of the Act. Specifically, the Board concluded that although these employees have access to the Governor's proposed budget before it is made public, "the information does not have any connection to the labor relations or collective bargaining negotiations." ALJ decision, 25 PERI ¶ 161, at 749. However, confidential employees *148 include, among others, those employees who, "in the regular course of [their] duties, ha[ve] authorized access to information relating to the effectuation or review of the employer's collective bargaining policies." 5 ILCS 315/3(c) (West 2008).
¶ 169 Here, in the regular course of their job duties, these employees have authorized access to the Governor's nonpublic budget proposals. Such access reveals information that would most certainly impact the effectuationthat is, the putting into operation ofCMS's collective-bargaining policies.
¶ 170 Accordingly, the IDOR Research Office PSA 2s should have been excluded from the bargaining unit as confidential employees.

¶ 171 ii. IDOR Budget and Planning Office

(Lisa Ackerman and Andy Grapes)

(Confidential)
¶ 172 The Board also included the IDOR Budget and Planning Office PSA 2s in the RC-62 bargaining unit because it concluded that they were not confidential employees for purposes of the Act. Specifically, the Board concluded that although evidence existed that (1) these employees' supervisor was involved in collective-bargaining negotiations and (2) these employees collected detailed budgetary information that the supervisor used in those labor negotiations, the employees were not confidential employees because "there [was] no evidence that [the supervisor was] primarily responsible for [CMS's] labor relations matters, that he makes recommendations with respect to labor relations strategy or that he drafts management proposals and counter proposals." (Emphasis added.) ALJ decision, 25 PERI ¶ 161, at 750. However, as previously outlined, confidential employees include, among others, those employees who, "in the regular course of [their] duties, assist[ ] and act[ ] in a confidential capacity to persons who formulate, determine, and effectuate management policies with regard to labor relations." 5 ILCS 315/3(c) (West 2008).
¶ 173 Here, in the regular course of their job dutieswhich we note does not necessarily require that the job duty be done with consistency or regularitythese employees assist and act in a confidential capacity to their supervisor, who is clearly involved in formulating, determining, and effectuating CMS's policies related to labor relations. Namely, these employees' supervisor utilized the budgetary information they collected, including detailed cost analyses, in CMS's labor negotiations.
¶ 174 Accordingly, the IDOR Budget and Planning Office PSA 2s should have been excluded from the bargaining unit as confidential employees.

¶ 175 iii. IDNR Office of Administration

Terry Von Bandy

(Confidential)
¶ 176 The Board next included the IDNR Office of Administration PSA 2, Von Bandy, in the RC-62 bargaining unit because it concluded that he was not a confidential employee for purposes of the Act. Specifically, the Board concluded that although Von Bandy has access to "personnel records, staffing needs, and [IDNR's] long range strategic plans," he is not a confidential employee. ALJ decision, 25 PERI ¶ 161, at 750. Again, confidential employees include, among others, those employees who, "in the regular course of [their] duties, ha[ve] authorized access to information relating to the effectuation or review of the employer's collective[-]bargaining policies." 5 ILCS 315/3(c) (West 2008).
*149 ¶ 177 Here, in the regular course of his job duties, Von Bandy has authorized access to information related to the effectuation or review of CMS's collective-bargaining policies. Namely, Von Bandy has access to, among other things, IDNR's long-range strategic plans and staffing needs, which is information that would certainly relate to or impact the effectuation or review of CMS's collective-bargaining policies.
¶ 178 Accordingly, Von Bandy should have been excluded from the bargaining unit as a confidential employee.

¶ 179 iv. IDNR Office of Land Management

(Jeffery Oxencis)

(Confidential)
¶ 180 Finally, the Board included the IDNR Office of Land Management PSA 2, Oxencis, in the RC-62 bargaining unit because it concluded that he was not a confidential employee for purposes of the Act. Specifically, the Board concluded that although Oxencis (1) provides financial data for use in collective-bargaining negotiations and (2) has access to the Office of Land Management's budget and salary information, he is not a confidential employee. As we have repeatedly explained, confidential employees include, among others, those employees who, "in the regular course of [their] duties, ha[ve] authorized access to information relating to the effectuation or review of the employer's collective[-]bargaining policies." 5 ILCS 315/3(c) (West 2008).
¶ 181 Here, in the regular course of his job duties, Oxencis has authorized access to information relating to the effectuation or review of CMS's collective-bargaining policies. Specifically, Oxencis has authorized access to (1) financial data used directly in collective-bargaining negotiations and (2) the Office of Land Management's budget and salary information, which would most certainly be used by CMS in effectuating its collective-bargaining policies.
¶ 182 We note that in rejecting CMS's attempt to exclude Oxencis from the RC-62 bargaining unit as a confidential employee, the Board emphasized that Oxencis does not have "knowledge of or input into [CMS's] collective bargaining strategy." ALJ decision, 25 PERI ¶ 161, at 751. Such strategic knowledge, however, is not required. Instead, as outlined above, to be a confidential employee, an employee need only have access to the information relating to the effectuation or review of the employer's collective-bargaining policies.
¶ 183 Accordingly, Oxencis should have been excluded from the bargaining unit as a confidential employee.

¶ 184 b. The Managerial PSA 2 Employees

¶ 185 i. IDOR Office of Publication Management

(Virginia Bartletti, Teresa Blauvelt, Beau Elam, Candace Erwin, Vickie Harvey, Sheri Hoff, Teresa Richards, Jennifer Schwitek, Julie Southwell, and Susan Spada)

(Managerial)
¶ 186 The Board included the IDOR Office of Publication Management PSA 2s in the RC-62 bargaining unit because it concluded that they were not managerial employees for purposes of the Act. Specifically, the Board concluded that these employees were not managerial because they "do not independently formulate policy and [thus], do not have final responsibility to implement and effectuate policy." ALJ decision, 25 PERI ¶ 161, at 751. However, exclusivity in the implementation of management policy is not a requirement under that Act. See 5 ILCS *150 315/3(j) (West 2008) (managerial employees are those employees who are "engaged predominantly in executive and management functions and [are] charged with the responsibility of directing the effectuation of management policies and practices").
¶ 187 Here, the Office of Publication Management PSA 2s (1) engage predominantly in management functions in that they develop and revise IDOR publications and policies and (2) direct the effectuation of management policies and practices. In other words, they direct the IDOR Publication Management Office in a hands-on way. The fact that these employees do not do so "independently" is unimportant, given that the Act does not require such independence in management functions.
¶ 188 Accordingly, the IDOR Office of Publication Management PSA 2s should have been excluded from the bargaining unit as managerial employees.

¶ 189 c. The Supervisory PSA 2 Employees
¶ 190 Before proceeding to our analysis related to those employees who the Board determined were not supervisory under the Act, we note that the definition of supervisor in this context has two prongs. Specifically, supervisors are those employees who (1) engage in work that is "substantially different from that of [their] subordinates"; and (2) "ha[ve] authority, in the interest of the employer, [(a)] to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, [(b)] to adjust their grievances, or [(c)] to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment." 5 ILCS 315/3(r) (West 2008). For each of the following employees, the Board concluded that their principal work is "visibly and obviously different from the principal work of her subordinates." Neither party challenges the Board's determination in that regard. Thus, no question arises as to the first prong of that analysis. Accordingly, we address only the second prong in our analytical review.

¶ 191 i. IDOR Motor Vehicle Use Tax Division

(Mary Green)

(Supervisory)
¶ 192 The Board included IDOR Motor Vehicle Use Tax Division PSA 2 Green in the RC-62 bargaining unit because it concluded that she was not a supervisory employee for purposes of the Act. Specifically, the Board concluded that because Green does not discipline her subordinates with "independent judgment," in that her supervisor is involved in "every step" of the disciplinary process. However, the Board's decision demonstrates that it improperly views "independent judgment" to mean that Green could not involve any other employee in her disciplinary decision-making process.
¶ 193 Here, the Board first noted that Green supervises 4 IDOR offices and 11 subordinates. In rejecting Green as a supervisor, however, the Board relied almost exclusively on the fact that Green's supervisor "signs off" on many of the disciplinary measures she takes, noting that certain incidents, such as those involving cash shortages, must be resolved by internal affairs. This analysis, however, ignores the third option of the second prong of the Act's definition of a supervisor. If an employee, such as Green, effectively recommends such discipline with independent judgement, that is sufficient to meet the Act's definition of a supervisor. See 5 ILCS 315/3(r) (West 2008) (those who "ha[ve] authority, in the interest of the employer, to * * * effectively recommend [discipline], if the exercise of that authority *151 is not of a merely routine or clerical nature, but requires the consistent use of independent judgment"). The evidence shows that Green's recommendations are effectivethat is, they are almost always adopted by her supervisor. The fact that Green involves her boss in decisions that her boss later implements not only does not exclude Green from supervisory status under that Act, it also makes her an effective and conscientious supervisor of State employees and resources.
¶ 194 Accordingly, Green should have been excluded from the bargaining unit as a supervisor.

¶ 195 ii. IDOR Sales Tax Division

(Chet Billows, Mitzi Brandenburg, and Susan Lonzerotti)

(Supervisory)
¶ 196 The Board included the IDOR Sales Tax Division PSA 2 employees in the RC-62 bargaining unit because it concluded that they were not supervisory employees for purposes of the Act. Specifically, the Board concluded that because, "[i]n most cases, [their supervisor] reviews the[ir] evaluations * * * before the evaluations are presented to the employees," these employees were not supervisors under the Act. ALJ decision, 25 PERI ¶ 161, at 754. However, the Board's decision demonstrates that the Board improperly interpreted "independent judgment" to mean that these employees could not involve their supervisor in their disciplinary decision-making process. Put another way, the Board incorrectly views "independent judgment" under the act as synonymous with "unilateral discipline."
¶ 197 Here, the Board again ignores the third option of the second prong of the Act's definition of a supervisor. That is, if employees, such as these section managers, effectively recommend such discipline with independent judgement, that is sufficient to meet the Act's definition of a supervisor. See 5 ILCS 315/3(r) (West 2008) (those who "ha[ve] authority, in the interest of the employer, to * * * effectively recommend [discipline], if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment"). The record reveals that these section managers' recommendations as to discipline are effective. Indeed, as the Board pointed out, if modifications are made to the recommended discipline, it involves only minor modifications such as instructions to add "a comment" to subordinate evaluations.
¶ 198 Accordingly, the IDOR Sales Tax Division PSA 2s should have been excluded from the bargaining unit as supervisors.

¶ 199 iii. IDOR Document, Control, and Deposit Division

(Joseph Terry Emmett)

(Supervisory)
¶ 200 The Board also included IDOR Document, Control, and Deposit Division PSA 2 employee Emmett in the RC-62 bargaining unit because it concluded that he was not a supervisory employee for purposes of the Act. Specifically, the Board concluded that although Emmett has authority to independently assign and monitor work, evaluate employees, and approve time off for his subordinates, he is not a supervisor because CMS failed to present evidence that he "possesses the necessary discretion to affect the terms and conditions of his subordinates' employment in areas such as discipline, transfer, promotion or hire." ALJ decision, 25 PERI ¶ 161, at 754. However, the Board incorrectly focused on what CMS failed to show, rather than what it did show.
¶ 201 Here, CMS presented evidence that Emmett has authority to independently *152 assign and monitor work, evaluate employees, and approve time off for his subordinates. This job description clearly satisfies the requirement under the Act that a supervisor "direct" his subordinates with independent judgment. See 5 ILCS 315/3(r) (West 2008) (supervisors include those employees who "ha[ve] authority, in the interest of the employer, to * * * direct * * * if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").
¶ 202 Accordingly, IDOR Document, Control, and Deposit Division PSA 2 employee Emmett should have been excluded from the bargaining unit as a supervisor.

¶ 203 iv. IDOR Individual Processing Division

(Paula Hamrock, Monica Marchizza, Dottie Perkins, Cathy Scott, and Sheila Washburn)

(Supervisory)
¶ 204 The Board included the IDOR Individual Processing Division PSA 2 employees in the RC-62 bargaining unit because it concluded that they were not supervisory employees for purposes of the Act. Specifically, the Board concluded that although these section managers independently counsel subordinates and issue reprimands, they are not supervisory because "the involvement of [others] prevents [them] from exercising independent judgment when determining whether to issue discipline." ALJ decision, 25 PERI ¶ 161, at 755. However, the Board's decision in this respect again demonstrates that it improperly views the term "independent judgment" to mean that employees cannot involve anyone else in their disciplinary decision-making process.
¶ 205 Here, the Boardas it did throughout its decisionignores the third option of the second prong of the definition of a supervisor. That is, if employees, such as these section managers, effectively recommend such discipline with independent judgement, that is sufficient to meet the Act's definition of a supervisor. See 5 ILCS 315/3(r) (West 2008) (those who "ha[ve] authority, in the interest of the employer, to * * * effectively recommend [discipline], if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").
¶ 206 Accordingly, the IDOR Individual Processing Division PSA 2s should have been excluded from the bargaining unit as supervisors.

¶ 207 v. IDOR Excise Tax Division

(Brock Reynolds and Brian Spelman)

(Supervisory)
¶ 208 The Board included the IDOR Excise Tax Division PSA 2 employees in the RC-62 bargaining unit because it concluded that they were not supervisory employees for purposes of the Act. Specifically, the Board concluded that although these section managers (1) independently counsel subordinates and document that counseling in the employee's personnel file, (2) issue (a) discipline and (b) oral and written reprimands for attendance violations, they are not supervisors because the level of discipline imposed was unclear from the evidence and that they often consult others before issuing such discipline. The Board's decision in this respect, however, is yet another example of its improper view that the term "independent judgment" means that employees cannot involve anyone else in their disciplinary decision-making process.
¶ 209 Here, the Board again ignores the third option of the second prong of the Act's definition of a supervisor. That is, if employees, such as these section managers, *153 effectively recommend such discipline with independent judgment, that is sufficient to meet the Act's definition of a supervisor. See 5 ILCS 315/3(r) (West 2008) (those who "ha[ve] authority, in the interest of the employer, to * * * effectively recommend [discipline], if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").
¶ 210 Accordingly, the IDOR Excise Tax Division PSA 2s should have been excluded from the bargaining unit as supervisors.

¶ 211 vi. IDOR Taxpayer Assistance Division (Chicago)

(Mike Mikels)

(Supervisory)
¶ 212 The Board included IDOR Taxpayer Assistance Division (Chicago) PSA 2 employee Mikels in the RC-62 bargaining unit because it concluded that he was not a supervisory employee for purposes of the Act. Specifically, the Board concluded that although Mikels has authority to independently assign, monitor, and evaluate the work of 13 subordinates, as well as approve time off for those subordinates, he is not a supervisor because CMS failed to present evidence that he "possesses the necessary discretion to affect the terms and conditions of his subordinates' employment in areas such as discipline, transfer, promotion or hire." ALJ decision, 25 PERI ¶ 161, at 757. However, the Board once again incorrectly focused on what CMS failed to show, rather than what it did show.
¶ 213 Here, CMS presented evidence that Mikels has authority to independently assign and monitor work, evaluate employees, and approve time off for his subordinates. This job description clearly satisfies the requirement under the Act that a supervisor "direct" his subordinates with independent judgment. See 5 ILCS 315/3(r) (West 2008) (supervisors include those employees who "ha[ve] authority, in the interest of the employer, to * * * direct * * * if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").
¶ 214 Accordingly, IDOR Taxpayer Assistance Division (Chicago) PSA 2 employee Mikels should have been excluded from the bargaining unit as a supervisor.

¶ 215 vii. IDOR Taxpayer Assistance Division (Statewide)

(Linda Bennett, Denise Byrne, Sherry Sampson, Janine Stroble, Claire Tegtman, and Jim Walkington)

(Supervisory)
¶ 216 The Board included IDOR Taxpayer Assistance Division (Statewide) PSA 2 employees in the RC-62 bargaining unit because it concluded that they were not a supervisory employees for purposes of the Act. Specifically, the Board concluded that although these section managers (1) "oversee their respective sections, monitor subordinates, schedule, approve time off and complete performance evaluations," and (2) counsel and discipline those subordinates, they are not supervisors because "[t]here is little evidence in the record * * * that the [s]ection [m]anagers discipline with independent judgment." ALJ decision, 25 PERI ¶ 161, at 757. The Board's decision in this respect, however, is yet another example of its improper interpretation of the term "independent judgment" to mean that employees cannot involve anyone else in their disciplinary decision-making process.
¶ 217 Here, the Board once again ignores the third option of the second prong of the Act's definition of a supervisor. That is, if employees, such as these section managers, effectively recommend such discipline *154 with independent judgement, that is sufficient to meet the Act's definition of a supervisor. See 5 ILCS 315/3(r) (West 2008) (those who "ha[ve] authority, in the interest of the employer, to * * * effectively recommend [discipline], if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").
¶ 218 Accordingly, the IDOR Taxpayer Assistance Division (Statewide) PSA 2 employees should have been excluded from the bargaining unit as supervisors.

¶ 219 viii. IDOR Business Processing Division

(Kevin Anguish, Mary Austin, Donna Mast, Matt Smith, Shirley McGlennon, and Brenda Cawley)

(Supervisory)
¶ 220 The Board included the IDOR Business Processing Division PSA 2 employees in the RC-62 bargaining unit because it concluded that they were not a supervisory employees for purposes of the Act. Specifically, the Board concluded that although these section managers (1) oversee their respective sections and subordinates, make assignments, perform quality review, and conduct performance evaluations, and (2) counsel subordinates and make recommendations as to whether trainees should be terminated, they are not supervisors because CMS did not present evidence that the ultimate determination with respect to discipline was solely the result of the section managers' recommendations. 25 PERI ¶ 161, at 737. The Board's decision in this respect is yet one more example of its improper view that the term "independent judgment" means that employees cannot involve anyone else in their disciplinary decision-making process.
¶ 221 Here, the Board one last time ignored the third option of the second prong of the Act's definition of a supervisor. If employees, such as these section managers, effectively recommend such discipline with independent judgement, that is sufficient to meet the Act's definition of a supervisor. See 5 ILCS 315/3(r) (West 2008) (those who "ha[ve] authority, in the interest of the employer, to * * * effectively recommend [discipline], if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment").
¶ 222 Accordingly, the Business Processing Division PSA 2 employees should have been excluded from the bargaining unit as supervisors.

¶ 223 IV. EPILOGUE
¶ 224 We note in closing that at oral argument in this case, we inquired into which of the tens of thousands of State executive branch employees would be excluded from collective bargaining under the Act. AFSCME's counsel responded that AFSCME believed that perhaps "the Governor and his policy team" would not be included because they report directly to the citizenry, but that most everyone else could be included. AFSCME's position is instructive because it demonstrates that AFSCME views the Board's interpretation of the Act the same way we doextraordinarily broad. Unlike AFSCME, however, we do not believe that the General Assembly intended such a broad construction. Had that been the General Assembly's intention, it would simply have excluded the Governor and his policy team rather than excluding all managerial, confidential, and supervisory employees. See People v. Smith, 236 Ill.2d 162, 167, 337 Ill.Dec. 700, 923 N.E.2d 259, 262 (2010) (the primary goal of statutory construction is to "ascertain and give effect to the drafters' intention, and the most reliable indicator of *155 intent is the language used, which must be given its plain and ordinary meaning").

¶ 225 V. CONCLUSION
¶ 226 For the reasons stated, we (1) affirm the Board's decision to deny an oral hearing to several disputed PSA 2 employees, but reverse the Board's decision to deny an oral hearing to the disputed PSA 2 employees listed in subsection A(5) of this opinion with directions that the Board provide those employees an oral hearing, and (2) reverse the Board's finding that the PSA 2 employees who were granted an oral hearing should not be excluded under the Act.
¶ 227 Affirmed in part and reversed in part; cause remanded with directions.
Justices APPLETON and POPE concurred in the judgment and opinion.